at all. Oral argument not to exceed 15 minutes per side. Mr. Coleman for the Plaintiff Appellant. Good afternoon. May it please the Court. My name is Clint Coleman. I represent the Appellant, Mr. Cameron Joseph Cooper. Your Honors, as you're aware, this is an ADA case. We're here about whether Mr. Cooper has made a prima facie showing that he is otherwise qualified to be a delivery merchandiser despite his Tourette's Syndrome. As the Court is aware, the prima facie burden is not an onerous one, but one that is easily met. The standard of review on this issue is de novo. This is a direct evidence case, right? Yes, Your Honor, because we pursued a failure to accommodate claim. So there's no question that there's a disability. There's no dispute that giving excellent customer service was an essential job function. Is that right? For the purposes of summary judgment, we did not dispute that, Your Honor. Okay, so one of your arguments below and before this Court is whether your client could perform his job without an accommodation. Yes. Right. And I'm struggling with that because at least in 2018, and part of your argument is that his tics were the same throughout his employment. Well, in 2018, his doctor said he needed to be with another driver. So essentially his doctor is saying he needed an accommodation. So help me square that with your argument that he doesn't need an accommodation. Your Honor, I think his doctor, I guess our answer to that would be that his doctor was just trying to help him out because it was Coca-Cola that viewed him as being unqualified for the position. And that would be the upper management at Coca-Cola. But if you look at the declarations that we've submitted. That was in 2018. I don't know that Coca-Cola at that time said he was unqualified. There were several times where he was placed on short-term disability, placed with another driver, things of that nature. But at that time, I don't think Coca-Cola was saying you can't do this job. His doctor was saying, you know, after coming back from short-term disability, that he needed to be with another driver. As I see it, as an accommodation, because he couldn't do it without an accommodation. Your Honor, we didn't focus on this as much in the appellate brief. But at the lower court, we focused on the fact that it wasn't Mr. Cooper that asked for these leaves of absences. They were actually, it was Coca-Cola who sort of forced upon Mr. Cooper these leaves. And so therefore, he was just trying to do whatever he could to get back to work. And part of that would be to go to his doctor. That's true of the leaves. He testified to the fact that Coca-Cola forced him out. But is it true, I thought the testimony with respect to the helper driver was that he was the one that took the initiative for that. Again, Your Honor, I believe the record would reflect that there was a choice given as to another leave of absence or switch to a different non-customer facing position. And Mr. Cooper chose, rather than take an unpaid leave, to ask for that accommodation of being a driver helper. But it's always been his position and our position that he wasn't otherwise qualified for the job. And he was simply just trying to do what he needed to, according to Coca-Cola, to remain at work and continue to get paid. So just dividing your argument, I think the way I see your argument is in two parts. One is that there is a factual dispute about whether anybody can understand what he's saying. And then the second one is, even if people could understand, it's still there's a factual dispute on whether, if they could understand that he was using racial slurs, that that would show that he can't provide excellent customer service. And so on the first one, I would agree with you that there's a factual dispute on the amount of times people could understand him. But it seems to me that there's plenty of evidence that I would say at least in some situations people could understand him. What do you make of, like, the everybody agrees the September 2017 event happened. And there's contemporaneous email from SEITER, I guess is how you pronounce it, S-E-I-T-E-R, that documents clients complaining that they heard racial slurs. So how is that not undisputed? Your Honor, I would say that the fear from Coca-Cola was that customers would hear Mr. Cooper's tics and the racial slurs and those sorts of things upon first meeting him and therefore take issue with him. But I think the record reflects that it took some time for people to begin to be able to understand his tics. Even the Dollar General example in 2017, he had been servicing that store for at least a year at that point. So by that point it was clear to Dollar General and to everyone around, and the record reflects this, that Mr. Cooper did have a disability. I thought, and part of the email was that he was freely and repeatedly using racial slurs and that Dollar General's customers were in the store. And as I understand, the email could hear it as well. That's why the loss prevention person went out to try to diffuse the situation. It seems to me that maybe there is an argument. Maybe it's like even predominantly nobody can understand what he is saying. But there are certain circumstances where they can. And I would think that at least that component is undisputed. Perhaps there may be one instance in the record in 2017 that a customer of Dollar General did hear Mr. Cooper. But I think the record reflects as a whole that for the most part people could not understand his tics. And I would point the court to, I believe it was Mr. Mueller, and the record said that he worked with Cooper and didn't understand that Mr. Cooper was saying the N word until 2018. So he had been working with him for one or two years at that point. With Coca-Cola? Yes. I mean what evidence do we have from the customers that said that they couldn't understand what he was saying? I'm not sure the record reflects any evidence from customers, but the record does reflect evidence from his direct supervisors that they did not receive complaints regarding whether or not customers could hear those tics. And those supervisors testified that they would have been in a position to receive those kinds of complaints. And Mr. Sider in his affidavit even said that it was the regular practice of Coca-Cola to report those complaints to the supervisors. So I think the lack of complaints would be one form of evidence that would show. Was the 2017 complaint made before he took the FMLA leave and had his medication adjusted and did various other things? I believe that's correct, Your Honor. I believe it was the 2017 incident that prompted the FMLA leave. So was there any evidence after the 2017 leave that his language was actually heard by a customer? I think there's plenty of dispute in the record after 2017 of whether or not there were any more complaints from customers. There's a few incidences that were disputed. There's the 2018 bread box incident, which the record reflects had nothing to do with Mr. Cooper's tics. It was unsubstantiated and it was at that point that Coca-Cola said that they discovered that Mr. Cooper's tics were, quote, once again out of control. Again, it's disputed whether those tics changed over time or not. So the reasonable inference there would be that they didn't change over time. There was the interesting feature in his deposition of the counsel for the company apparently questioning him during the deposition and he revealing that he had been using racial slurs during the deposition but that the counsel had not understood him. Yes, Your Honor, and I think that's a powerful point. The lower court disregarded that, saying that the words of counsel are not evidence, but I think that we have to look at it as if Mr. Cooper were answering a question. Just like any other question, he just reacted to what was asked of him. So I think that it would be unfair to not include that in the record. How do we make the fact that the court reporter didn't include them in his statements, I suppose, would reiterate that? Your Honor, we addressed that in a declaration. Mr. Cooper testified in his declaration that he was, in fact, saying the racial slurs throughout his deposition, but that the court reporter a few times at least said that the word near, N-E-A-R, was put into the transcript. So it became evident that she misinterpreted what he was saying. So it seems like there's a risk that this could happen at any occasion, and that's what maybe the company is worried about. I was trying to think of hypoanalogies, and suppose there's somebody, and they have a manual labor job and they have to carry a box, and they can carry the box 99 out of 100 times, but occasionally they have some type of disability that leads them to damage the goods because they drop it or something. I think there's an argument there that you wouldn't be able to perform the essential functions of your job if your job is to carry it all the time. So the analogy, I suppose, would be it's unclear how often individuals can understand him, but it seems to me that there are at least some instances where individuals understood him, and so the risk is always there. And why isn't the risk enough to show that he can't do the essential functions of his job? I think our answer to that would be that while the risk might always be there, you have to couple that with other factors, and one of those factors being that the record makes clear that it's very evident to those around him that Mr. Cooper has a disability. So it's not just that he's saying these words. He has facial tics. He barks, for example. He makes a whooping sound. So it's fairly apparent to anyone around him that he suffers a disability, and it's not just that he's blurting out these words. Does the record indicate how often he has these other tics? I'm not sure anywhere in the record does, Your Honor. I think that in front of a jury it would be fairly evident how often it occurs, but because they're sort of these nondescript sounds, it would be hard for a court reporter to put it in a transcript. So wholly apart from the racial and sexist slurs, let's change the facts of the case. We don't have any of those. It's simply the normal Tourette's tics, which include odd noises and facial grimaces. Assuming that's the fact, could Coca-Cola terminate him from a position of being a general delivery driver? I don't believe so, Your Honor. I think a large part of the reason that Coke argues this and that the lower court agreed was that it was the racial slurs and the other sort of epithets that made what Cooper was saying or doing objectively offensive. So I think taking it outside of those specific tics, then no, there would be no reason to. Because you would say he would be qualified to be a customer-facing delivery driver, even though he's dropping off Coca-Cola to places where there are lots of regular customers who don't know anything about him or anything. Yes, Your Honor. In your view, he is fully qualified. Yes, Your Honor. I think the record would reflect that, and I think there's case law out there where people with Tourette's syndrome, similar to those sorts of tics, I think there's case law that would suggest that those people are otherwise qualified. And I see that I'm out of time, so unless there's any other questions. Thank you very much. Thank you. May it please the Court. My name is Jeff Patton, and I'm here today representing Coca-Cola Consolidated, Inc. Just as a very quick aside, oftentimes Coca-Cola is used to refer to my client. We're not Coca-Cola. We're just a small independent bottling company. But for purposes of vocabulary, Coca-Cola is how they're normally referred to. But I just wanted to clarify that was not us. In this instance, in a failure to accommodate case, the district court properly determined that there was not a genuine dispute of fact over whether or not he was qualified. And then the court took it a step further and said even if he were to be qualified, he didn't fulfill his burden to show that my client didn't reasonably accommodate him. And then also found as to the parallel sort of claim that falls under the ADA of constructive discharge, there was no genuine dispute of fact that the position that he was transferred to in the warehouse met the high standard of intolerability for a constructive discharge claim. But I think he's arguing that he doesn't need an accommodation, right? He's saying don't need an accommodation really because the customers can't hear what he's saying. So that's at least part of the argument. So how do you respond to that? That's certainly part of his argument, Judge Mathis. And he actually argues both ways, right? He says I don't need an accommodation. And then at the end in December of 2019, which is the real focus here, the time that he was transferred from a customer-facing job to the warehouse, what was going on then, and that's when he requested his accommodations at that time. He was not qualified to do the job, and the evidence is not in dispute, but that he was audibly and understandably saying the N word and other profanities in customer stores and in public. The fact that it is not audible all the time doesn't mean that it wasn't happening some of the time. In fact, it was in his own deposition, Mr. Cooper acknowledged that his use of the words, the frequency of it really never changed. He's done it his whole life. It would vary somewhat depending on how much stress or anxiety was happening in a given day, but he's always uttered these words. You said that in his deposition, but his deposition has no evidence recorded that anyone understood it. Absolutely. I was, in fact, Judge Murphy, the attorney who took that deposition, I didn't hear any barking, whooping, or use of the N word. Isn't that pretty good evidence that nobody would generally be able to understand? Judge Murphy, I think that's evidence that either he was not, in fact, saying the N word throughout his deposition, or if he was, that's one of the instances where it was more controllable, because the fact that he didn't do that a year and a half ago in a deposition doesn't impact the fact that throughout 2017 and 2018, multiple different Dollar General stores, multiple employees from those stores, were making reports of his use of the N word. They were clearly hearing it. He was banned. He put it in his own complaint that Dollar General was making these reports about him throughout 2017 and 2018, that he was banned from six Dollar General stores and, quote, all others in the area because of using those. And I think it's also important for us to look at the fact that when we got into specifics, the best evidence I saw of this, aside from the complaint, was the Cedar email from about September 2017. Do you have other examples to support the idea that it was nonstop, not just that he was using it, but that people could understand? That people could understand it, yes. Well, Mr. Cooper himself testified in his deposition on questioning that the words he used was they could hear it and understand it at times. Well, that was a compound question. It was a compound question, so it was difficult. And then I thought he went on to somewhat clarify that what he meant was that he was using it, not necessarily that people could understand. The evidence that he was using it and what the district court pointed to was the fact that he himself said that Dollar General was reporting it throughout 2017 and 2018. But the fact that Dollar General might have been reporting it might not mean that it had happened, that he was agreeing that it had happened. Can you be precise as to exactly when? You mentioned the 2017, and in my prior questions, I was wondering how the 2017 event compared to his taking the FMLA leave and getting treatment. And I thought the 2017 event preceded his getting treatment. Am I correct on that? The incidents occurred both prior to that and well after that as well. So can you give us an idea of what specific complaints were in fact made by Dollar General that he was in fact using the N-word? Yes, and I think that they're detailed in the district court opinion as well. They cited to the specific months and instances and by store location as to what was being reported and which stores he was banned from. In his own complaint, he reports that and goes through the detail in paragraphs 15 through 23 of his complaint, his amended complaint, that in fact these complaints were being made and these reports were being made to Coca-Cola Consolidated. And he never once said, I wasn't making those, wasn't uttering those words. I think it's also important the testimony of the co-workers, Mr. Yauman, Ms. Nuttall, Mr. Mueller, and Mr. Rogers. And again, the pertinent event here, we haven't even discussed yet, which is November and December of 2019, Caleb, the trainee he was working with on that day, all of them testified that it's in the record that he was using the N-word. They could understand it when they were interacting and talking to him. It's also important to look at these FMLA leaves. So were the customers actually hearing the words or was it these people who regularly worked with him who knew him by virtue of having worked with him regularly and having been able to decipher his language? It was twofold. When we think of a customer, Dollar General was a customer of Coke Consolidated. So it was the employees of Dollar General who were hearing it and were reporting it. And then there were also within those some instances where their customers, some members of the public, were hearing those words as well. But when he took the FMLA... Do you think the difference matters? I'm sorry? Do you think the difference matters? The reason why, so I kind of view this as two arguments for why we should reverse. The first is there's a dispute of fact over whether people could understand. And the second is even if some people could understand, it's still there is a dispute of fact about whether he provided excellent customer service despite his use of the racial slurs. And there is an argument that if it was only Dollar General's direct customers, meaning the, excuse me, Coca-Cola's direct customers, meaning Dollar General and not the ultimate consumer, that we should say that there's a dispute of fact over whether he could provide excellent customer service because they all knew that it was involuntary and we shouldn't be judging people based on actions that they have no control of. And so why would we say that that should take away from whether he could provide excellent customer service? So the concept of providing excellent customer service, courts that have looked at it consistently, courts that have looked at this version of Tourette's Syndrome, each time they've looked at it, when this is accompanied by racial slurs, by profanity, they've determined, and I'm referring to Ray v. Kroger and the cases cited within Ray v. Kroger that comes out of the 11th Circuit, also the Eastern District of Pennsylvania and DeFrancisco has looked at this, and the Petzold case out of the Court of Appeals in Michigan, that these words that he's using at these times, albeit involuntary, are offensive by their nature and that they took notice that these were objectively offensive words. So if he... I would agree with you. If it was somebody using it intentionally, it's a fireable offense. But if it's only the people that he has regular contact with and they all know that it's involuntary, shouldn't we assume good faith in those individuals and some compassion that he's got? Your Honor, it was involuntary in Ray v. Kroger and all the other cases that are cited in our brief. They're not binding on us. We have to decide for ourselves. And so my question for the other side was, if he just had a regular tick that Tourette's involves without the racial slurs and profanity, could he be fired? Would he be otherwise qualified? We can go through all the different stages of this. I think at that stage, Judge Moore, it's a factual question, just like in Taylor v. Food World. Well, assume my facts, that when he goes to Dollar General to deliver your product, he has these ticks that involve whooping and other kinds of things, not the racial slurs. Yes, Judge Moore. Would he be otherwise qualified for a job as he is? I think he absolutely would. So he wouldn't need an accommodation. He'd be able to keep on delivering because he would be giving excellent customer service. If he was not uttering offensive words, you're absolutely correct, Judge Moore. That's how that would come out. Why couldn't the company take the position? So that's kind of what we're trying to get at. Why couldn't the company take the position that if he's acting in a very strange manner, setting aside the racial slurs, it's not excellent customer service because people are going to be uncomfortable around him? And so your response is that it would be, I suppose, a factual question about what qualifies as excellent customer service, but why wouldn't that rule extend to this situation? Is it just a divide between racial slurs and other uncomfortable? I think there's an absolute divide between racial slurs and profanities of this nature and other types of words. And again, not binding on this circuit, not binding on your honors, but that's exactly what every court that looked at this has said, that these are not words that a business ought to have, ought to not be required to have their employees uttering in public. This isn't a situation, and what's interesting is even in Ray v. Kroger, this was a bagger at a Kroger store, he wanted to hand out a little card to people to explain, I have Tourette's, this is my tick, it's involuntary. And again, the court said, no, that's not enough. This is still, you're not qualified to do the essential functions of the job. I think what's important, though, is I think that even Mr. Cooper himself, when he took the FMLA and he certified, I have a serious medical condition, I'm unable to perform the essential functions of the job. He talked about the treatment he received after his first medical leave, where he engaged a new neurologist, did acupuncture, changed his medication. But in his deposition, he said, none of that changed anything. My condition has never changed over time. So it's not like he took the leave, got better, and went back to work and couldn't, and stopped using the ticks. It's very important, and your honors brought this up already, for his short-term disability. While he was out on leave, while on the short-term disability in June of 2018, he said, when I come back, he filled out a reasonable accommodation form and said, I need to be a driver helper or have someone else assigned to me. Two months later, when he returned from leave, his doctor said the same thing. He needs someone else assigned to him. And co-consolidated accommodated him. There was temporary positions available that time where you could be a driver helper. And that's what they brought him back at. It's not a permanent position. And he didn't suffer a reduction in pay. They didn't change his title. So they accommodated his request. The reason he took the two leaves is because he was using these words. We were getting these complaints in public. In two of the instances, we had co-consolidated employees hear and witness what the Dollar General people were hearing as well. But I think what's very important is that the district court didn't stop there. It didn't say, as a matter of law, there's no genuine dispute of fact. He was not qualified for making these comments. They went ahead and examined was he otherwise qualified. And they looked to the two accommodations that he requested in December of 2019. Can I ask, I know you deal with affidavit by affidavit, but he does have a powerful group of affidavits in his support. And coworkers or supervisors all give the opinion that he provided excellent customer service, notwithstanding his racial slurs. So why wouldn't that create? What's so strange is excellent customer service is such a vague term. So why wouldn't that create a genuine issue of material fact, especially if we have to accept his testimony that it stayed the same over time. So you can't use the different dates to kind of distinguish those affidavits. I think the declarations don't say he was providing excellent customer service during any relevant time period. And the district court did a great job of distinguishing those. Mr. Fitzpatrick left the company in 2016. And he was never even disclosed as a witness in this case at any level. But he was gone in 2016. So the fact that he observed good customer service doesn't speak to what was happening in November and December of 2019, the relevant time period. Mr. Garrett left in May of 2019. Mr. Bankston left in September of 2017. Interestingly about Mr. Bankston, he recalls, he puts in his affidavit, he recalls Mr. Cooper using the N word. He said there was a discussion about whether he should be transferred to the warehouse at that time. And he was adamant against it. And why? He said because there were some African American workers in the warehouse. And I didn't want that to be a problem. And that's their affidavit. I see my point. If I can.  My point was it's like suppose, suppose it's like how do you create a genuine issue of material fact on this vague opinion of excellent customer service? Suppose they actually said we fully recognize that he's using racial slurs in the stores. But we think he is providing excellent customer service. I think would your response be, and we said that that creates a genuine issue of material fact on this opinion about whether he was providing excellent customer service. Would your response be somehow that we could disregard that because it was just an opinion? I mean this was what the district court was getting at when the district court kind of opined as a matter of law. It can't possibly be excellent customer service if you're using racial slurs on the store floor. I think that that's 100% correct, Judge Murphy. If an employee is using racial slurs in issuing and uttering these type of profanities, there is no question that they are not qualified to do a job that requires that interaction. My instinct would be with you. But if you had affidavits, could you create a genuine issue? Or would we just say that we're allowed to rely on common sense? It's kind of tricky in my mind. It's interesting, Judge. I don't think that you could with affidavits. But in this case, there are no such affidavits in the record because none of these people say and discount all of the dollar general complaints. They don't discount what Caleb, the trainer, said was happening in November and December where he's frequently using the word on his route. None of those affidavits speak to that. They're saying our view of him was, and even some of them said we could hear the words, we don't believe he was not providing great customer service. But that doesn't mean that the other times that he was not uttering these words and not doing it. I think the other – Suppose you had depositions of two people in your client, in Coca-Cola, and one of the people says, I think he gave excellent customer service, even though he could be heard using profanity and racial slurs. And the other one says, no, he can't. Wouldn't there be a genuine issue of material fact there? I don't think under the case law from every other jurisdiction that's looked at this, I don't know that there would be, Judge Moore, because – Do you agree that there's a per se rule, as the district court seemed to say – So if the person was saying the F word or any other agreed upon profanity all the time, even if some of the people in the company said he can give excellent and is giving excellent customer service, that would not create an issue of fact. I think that if there is an essential element of a job is customer facing, providing excellent customer service, the two cannot go hand in hand, Judge Moore. I know my time is up. I'm happy to address any other questions. Thank you. Thank you very much. Your Honors, I wanted to point out something that the lower court failed to address entirely in its opinion and I don't believe Coca-Cola has addressed. Mr. Cooper now works for FedEx as a delivery driver. In that position, he is much more customer facing than any role he ever had with Coca-Cola. He doesn't have an accommodation. He receives excellent performance evaluations. His customers all love him. That's all in the record. This court has said in Vaughn v. Parkwest and many other cases that performing substantially similar work after termination without an accommodation creates an issue of fact as to whether that person is otherwise qualified. Your client, at least in 2019, he wanted an accommodation, right? He wanted the bulk route or I believe it was the Dollywood route instead of the warehouse. So he wanted an accommodation at that time. Your Honor, he wanted an accommodation insofar as it was clear that Coca-Cola was either going to put him on another unpaid leave of absence or make him take an accommodation. Their proposed accommodation was this warehouse position. He proposed the Dollywood route and these bulk routes. What should we do with the fact that his doctor said he needs to have a helper or he needs to be a helper? Correct me which it is that the doctor said. I think it goes back to Judge Murphy's point. The essential function of providing excellent customer service is so vague that it's sort of hard for a doctor to prescribe an accommodation for that. So I think our answer... Did the doctor say he had to be a helper or he needed a helper? I don't have my brief in front of me. I'm not entirely sure which the doctor said. But I think, again, our answer would be the doctor was just trying to help him get back to work. And we see that with doctors all the time. They do whatever they think is needed to get a person back to work. Did anyone ever retract that medical statement requirement? In other words, sometimes in cases you'll have a doctor say for eight weeks he needs to have somebody or he needs to have some kind of assistance. No, Your Honor. I do not believe that there was ever any retraction. So I guess there's some unclarity on that issue. The last point I would like to make is that my colleague says the declarations only cover small periods of time. Because of when each declarant might have worked there. But if you look at the timelines, combined, the declarants cover most, if not all, of Mr. Cooper's tenure there. And their knowledge would not be limited, as the lower court suggests, because if you give Mr. Cooper the inference that his tics did not change over time, then those declarants would have full knowledge of his abilities to perform excellence. I'll give you a chance to respond to the legal rule that the district court suggested, that there's just no genuine issue of material fact that you can't provide excellent customer service if you are using racial slurs on a floor that has customers and end customers as well. That strikes me as intuitive. And it may be intuitive, but I think it draws a false equivalency, Your Honor, between these words might be objectively offensive, but that does not mean that people are objectively offended by them. I think there's a big difference. The record is clear that people met Mr. Cooper with acceptance and understanding upon finding out about his disability. And in fact, most people didn't even hear the words that he was saying. So I see that I'm out of time. So your opponent mentioned this case from another circuit where somebody wanted to work as a bagger in a grocery store and give people a card. Would that be a reasonable accommodation here? I think that could have been an accommodation if an accommodation was necessary. But your client did not seek, first of all, says that he doesn't need an accommodation, and secondly, if he does need an accommodation, it was not the one that was sought. That's correct, Your Honor. Thank you both for your argument. The case will be submitted, and the clerk may recess court.